UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NEIGHBORHOOD HOUSE; and MARIIA MATSAI,<br>Plaintiffs,<br>v.<br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR.,<br>Defendants. | C26-3006 TSZ<br><br>ORDER |

What Congress hath giveth, an executive agency may not taketh away. In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), which was amended in 1997 to provide as follows:

> Qualified aliens under this paragraph shall be eligible for any designated Federal program.[1]
>
> . . . .
>
> An alien who is receiving benefits under the program defined in subsection (a)(3)(A) (relating to the supplemental security income

[1] The term "designated Federal program" includes "[a] State plan approved under title XIX of the Social Security Act, other than medical assistance described in section 1611(b)(1)(A) of this title." 8 U.S.C. § 1612(b)(3)(C). Section 1611(b)(1)(A) refers to medical assistance for "care and services that are necessary for the treatment of an emergency medical condition . . . and are not related to an organ transplant procedure." 8 U.S.C. § 1611(b)(1)(A).

> program) shall be eligible for medical assistance under a State plan under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.) under the same terms and conditions that apply to other recipients of benefits under the program defined in such subsection.

8 U.S.C. § 1612(b)(2)(F); see Pub. L. No. 105-33, § 5305(b), 111 Stat. 251 (1997). Among those who are considered "qualified aliens" are noncitizens who (i) are lawful permanent residents ("LPRs"), (ii) were granted asylum, (iii) were admitted as refugees, (iv) were paroled for urgent humanitarian reasons for at least one year, (v) are Cuban or Haitian entrants, or (vi) reside in the United States in accordance with a Compact of Free Association ("COFA.") See 8 U.S.C. § 1641(b).

When the PRWORA was amended in 1997 to add the above-quoted provision, § 1903(v)(1) of the Social Security Act, Title XIX of which governs the Medicaid program, read:

> Notwithstanding the preceding provisions of this section, except as provided in paragraph (2),[2] no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.[3]

---

[2] Paragraph 2 provides that "[p]ayment shall be made under this section for care and services that are furnished to an alien described in paragraph (1) [i.e., an noncitizen who is not an LPR or "permanently residing . . . under color of law"] only if– (A) such care and services are necessary for the treatment of an emergency medical condition of the alien, (B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan approved under this subchapter (other than the requirement of the receipt of aid or assistance under subchapter IV, supplemental security income benefits under subchapter XVI, or a State supplementary payment), and (C) such care and services are not related to an organ transplant procedure." 42 U.S.C. § 1396b(v)(2).

[3] The phrase "permanently residing in the United States under color of law" is not statutorily defined. See Sudomir v. McMahon, 767 F.2d 1456, 1459 (9th Cir. 1985) ("Congress has provided little help in fixing the content of this clause."). In Sudomir, then HHS Secretary Margaret M. Heckler took the position that "permanently residing . . . under color of law" had

42 U.S.C. § 1396b(v)(1) (1994 & Supp. II 1997). In other words, almost thirty years ago, when Medicaid funding for aliens who were not LPRs or "permanently residing . . . under color of law" had already been precluded, Congress included in the PRWORA a provision that clearly provided Medicaid-funded nonemergent medical assistance to qualified noncitizens who are receiving supplemental security income ("SSI") benefits.[4] *See* 8 U.S.C. § 1612(b)(2)(F).

In a letter dated April 8, 2026, addressed to a State Health Official ("SHO"), the Centers for Medicare and Medicaid Services ("CMS"), which is an agency within the United States Department of Health and Human Services ("HHS"), purported to strip away from certain qualified noncitizen SSI recipients (*i.e.*, asylees, refugees, and humanitarian parolees) the Medicaid benefits granted by the 1997 amendment to the PRWORA, which is codified at 8 U.S.C. § 1612(b)(2)(F). *See* SHO Letter at 6–7, Ex. A to Kas Decl. (docket no. 6 at 10–11). HHS's CMS has attempted to do so

---

two components: (i) an official determination by the Immigration and Naturalization Service that a noncitizen is "legitimately present in the country"; and (ii) a determination that the noncitizen is "legitimately present for an indefinite period of time." *Id.* at 1459–60. The Ninth Circuit concluded that Secretary Heckler's construction of the term was "a permissible one." *Id.* at 1461. The *Sudomir* Court further observed that a noncitizen who is granted asylum resides in the United States permanently even though asylum is a status that the Attorney General may at some later time revoke. *Id.* at 1462 n.9.

[4] As explained by Senator John McCain of Arizona, the PRWORA "denied certain forms of public assistance to legal immigrants who were residing in this country prior to enactment of the legislation" in 1996, and the 1997 amendment to the PRWORA restored SSI and Medicaid eligibility for "certain legal immigrants and refugees" who are disabled or elderly to "provide necessary safeguards for these vulnerable populations." *See* 143 CONG. REC. S8493-01, S8496 (daily ed. July 31, 1997).

notwithstanding Congress's silence on the subject and the absence of any legislation repealing or amending the PRWORA. See id.

Plaintiffs Neighborhood House, which provides case management for individuals who qualify for Medicaid daily-living assistance and receive such services in their home or a community-based setting, see Romero Decl. at ¶¶ 7 & 10 (docket no. 10), and Mariia Matsai, an SSI recipient who was paroled into the United States for humanitarian reasons after fleeing the war in Ukraine, Matsai Decl. at ¶¶ 2 & 10 (docket no. 5), seek a preliminary injunction to enjoin defendants HHS and Secretary Robert F. Kennedy, Jr. from implementing their erroneous interpretation of Public Law No. 119-21, also known as "HR 1" or the One Big Beautiful Bill Act ("OBBBA"). Pursuant to the Administrative Procedure Act ("APA"), plaintiffs assert that defendants have acted contrary to law, and/or in an arbitrary and capricious manner in issuing the SHO Letter, Ex. A to Kas Decl. (docket no. 6), and related State Implementation Tool, Ex. B to Kas Decl. (docket no. 6).[5] See Compl. at ¶¶ 66–88 & § VI (docket no. 1).

Having reviewed all papers filed in support of, and in opposition to, plaintiffs' motion for a preliminary injunction, docket no. 4, and having considered the oral arguments of the parties' attorneys and a Deputy Solicitor General for amicus curiae the State of Washington, the Court concludes that plaintiffs' motion for a preliminary

[5] Defendants do not dispute that the SHO Letter and State Implementation Tool constitute final agency action for purposes of seeking judicial review under the APA. See 5 U.S.C. § 704.

injunction must be granted and it hereby ENJOINS defendants, pending further order, from cancelling the Medicaid benefits conferred by Congress via the PRWORA.

**Background**

The Medicaid program was created in 1965 when Congress amended the Social Security Act of 1935 to add Title XIX, commonly known as the Medicaid Act.[6] *See Harris v. McRae*, 448 U.S. 297, 300–01 (1980). States may elect whether to participate in the Medicaid program, but if they choose to do so, they must comply with the requirements of Title XIX. *Id.* at 301. Title XIX outlines specific requirements for a State Medicaid plan, including that it "provide--(A) for making medical assistance[7] available . . . to--(i) all individuals-- . . . (II)(aa) with respect to whom supplemental security income benefits are being paid." 42 U.S.C. § 1396a(a)(10); 42 C.F.R. § 435.120. Under Title XVI of the Social Security Act, supplemental security income benefits are available to aged, blind, or disabled individuals who satisfy certain eligibility criteria.

---

[6] Title XIX of the Social Security Act authorized appropriations for the purpose of "enabling each State, as far as practicable . . . , to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1.

[7] The term "medical assistance" has a lengthy definition, which can be summarized as "payment of part or all of the cost" of statutorily enumerated care and services (or "the care and services themselves") for individuals who meet certain criteria (for example, age 65 or older, blind, disabled, etc.). *See* 42 U.S.C. § 1396d(a). Among the list of 32 forms of covered care and services are "case management services," "home and community care . . . for functionally disabled elderly individuals," and "personal care services" furnished to an individual in a home or location other than a hospital, nursing or intermediate care facility, or mental institution. *Id.* at § 1396d(a)(19), (22), & (24).

*See* 42 U.S.C. §§ 1381a, 1382, & 1382c. The Medicaid program is a "cooperative endeavor" via which participating States receive financial assistance from the federal government to defray a portion of the costs associated with health care provided to the needy. *See Harris*, 448 U.S. at 308.

The State of Washington participates in the Medicaid program, and its approved plan is administered by the Health Care Authority ("HCA"). *See* Wilson Decl. at ¶ 5 (docket no. 8). The HCA receives federal Medicaid funding, also known as Federal Financial Participation ("FFP"), which covers an average of sixty-seven percent (67%) of the expenditures for eligible enrollees. Wilson Decl. at ¶ 9 (docket no. 8). The HCA insures, through the Medicaid program, approximately 1.9 million people. *Id.* at ¶ 6. Roughly 14,000 of these current Medicaid beneficiaries in Washington are noncitizens who are not LPRs, Cuban or Haitian entrants, or residing in the United States pursuant to a COFA. *See id.* at ¶ 20. The HCA estimates that 1,258 of these noncitizens receive SSI benefits, and that 999 of them receive long-term care ("LTC") services funded through the Medicaid program. *Id.* at ¶ 22.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## **Discussion**

### **A. Preliminary Injunction**

Preliminary injunctive relief is an "extraordinary" remedy. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that a balancing of equities tips in favor of a preliminary injunction, and (4) that an injunction is in the public interest. Id. at 20. The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to which the first and third Winter factors are analyzed on a continuum; under such standard, a weaker showing on the merits, combined with a stronger demonstration on the balancing test, might warrant preliminary injunctive relief, assuming the second and fourth Winter elements are met. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Under this "sliding scale" method, the movant need only raise "serious questions going to the merits," but the balance of hardships must tip "sharply" in the movant's favor. Id. at 1131–32; see also Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir. 2012).

### **B. Likelihood of Success / Serious Questions on the Merits**

No dispute exists that plaintiff Mariia Matsai and other clients of Neighborhood House, including the mother of declarant Wahid Amiri, see Amiri Decl. at ¶¶ 3, 4, & 7 (docket no. 11), are "qualified aliens," receive SSI benefits, and are currently entitled to certain Medicaid benefits pursuant to 8 U.S.C. § 1612(b)(2)(F). Defendants concede, as they must, that HR 1 did not repeal or amend the PRWORA. Defendants contend,

however, that HR 1 should be viewed as defunding the Medicaid benefits authorized by the PRWORA. Neither the language of HR 1 nor the authorities cited by defendants support their view.

HR 1 amended § 1903(v)(1) of the Social Security Act as follows (added language in bold and underlined):

> Notwithstanding the preceding provisions of this section, except as provided in paragraphs (2), (4),[8] **<u>and (5)</u>**,[9] no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully

---

[8] Paragraph 4 was added in 2009, prior to HR 1, but after enactment of the PRWORA, and it indicates that "[a] State may elect (in a plan amendment under this subchapter) to provide medical assistance under this subchapter, notwithstanding sections 1611(a), 1612(b), 1613, and 1631 of Title 8, to children and pregnant women who are lawfully residing in the United States (including battered individuals described in section 1641(c) of Title 8) and who are otherwise eligible for such assistance." 42 U.S.C. § 1396b(v)(4)(A); <u>see also</u> Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3, § 214, 123 Stat. 8, 56–57 (2009).

[9] Paragraph 5 provides, in relevant part, as follows:

> Notwithstanding the preceding paragraphs of this subsection, beginning on October 1, 2026, except as provided in paragraphs (2) and (4), in no event shall payment be made to a State under this section for medical assistance furnished to an individual unless such individual is--
>
> . . .
>
> (i) a citizen or national of the United States;
>
> (ii) an alien lawfully admitted for permanent residence as an immigrant as defined by sections 1101(a)(15) and 1101(a)(20) of Title 8, excluding, among others, alien visitors, tourists, diplomats, and students who enter the United States temporarily with no intention of abandoning their residence in a foreign country;
>
> (iii) an alien who has been granted the status of Cuban and Haitian entrant, as defined in section 501(e) of the Refugee Education Assistance Act of 1980 (Public Law 96-422); or
>
> (iv) an individual who lawfully resides in the United States in accordance with a Compact of Free Association referred to in section 1612(b)(2)(G) of Title 8.

42 U.S.C. § 1396b(v)(5)(B).

> admitted for permanent residence or otherwise permanently residing in the United States under color of law.

*See* Pub. L. No. 119-21, § 71109(a)(1), 139 Stat. 72, 297 (2025) (codified as 42 U.S.C. § 1396b(v)(1) (emphasis added to reflect revision)). No change to the language that predated the PRWORA occurred, and Congress indicated no intent to alter the relationship between § 1903(v)(1) of the Social Security Act, which contains a general prohibition,[10] and the PRWORA, which either defines an exception to the general prohibition or clarifies that the general prohibition does not apply with respect to nonemergent medical assistance provided to qualified noncitizens who receive SSI benefits.

Defendants contend that the PRWORA cannot be construed as creating a payment obligation, but rather as merely defining which noncitizens are eligible for Medicaid (*i.e.*, qualified noncitizens who receive SSI benefits). *See* Defs.' Resp. at 11 (docket no. 21). According to defendants, because States' Medicaid plans must "adapt to any subsequent statutory or regulatory changes," HHS's reimbursement obligation is likewise flexible. *See id.* Defendants assert that HR 1 prevents HHS from using appropriated funds to pay

---

[10] Notably, paragraphs 2 and 4 of § 1903(v) outline exceptions to the general prohibition in § 1903(v)(1); paragraph 2 authorizes payment for emergent medical care (other than for an organ transplant) furnished to noncitizens who are not LPRs or "permanently residing . . . under color of law," and paragraph 4 permits States to provide medical assistance to children and pregnant women lawfully residing in the United States, notwithstanding the qualifications, waiting periods, and spousal income considerations otherwise imposed by the PRWORA. *See* 42 U.S.C. § 1396b(v)(2)&(4); *see also* 8 U.S.C. §§ 1612(b), 1613, & 1631. Like paragraphs 2 and 4, paragraph 5, which was added by HR 1, is preceded by the words "except as provided," and yet, defendants construe paragraph 5 as expanding, rather than narrowing, the preclusive effect of § 1903(v)(1).

FFP for medical assistance furnished to qualified noncitizen SSI recipients. The flaw in defendants' argument is incorrectly assuming that any statutory modification occurred with respect to qualified noncitizen SSI recipients. Nothing in HR 1 can be interpreted as rescinding HHS's reimbursement obligation with respect to the PRWORA.

In the Medicaid context, "medical assistance" means "(1) *federal funds*; (2) to be spent in 'payment of part or all of the cost'; (3) of certain services; (4) for or to '[p]atients meeting the statutory requirements for Medicaid.'" *Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1034 (9th Cir. 2011) (emphasis added); *see* 42 U.S.C. § 1396d(a); *see also supra* note 7. The PRWORA indicates that qualified noncitizens who receive SSI benefits are "eligible for *medical assistance*" pursuant to Title XIX of the Social Security Act "under the same terms and conditions" as other Medicaid recipients. 8 U.S.C. § 1612(b)(2)(F) (emphasis added). The PRWORA's reference to Title XIX of the Social Security Act and its use of the phrase "medical assistance" impose an obligation to pay federal funds for care and services provided to qualified noncitizen SSI recipients. Defendants' reading of the PRWORA and HR 1, which attempts to separate Medicaid eligibility from the funding of FFP, simply ignores the meanings assigned to the words of the statutes at issue.

Defendants' reliance on *Harris* to support their misinterpretation of HR 1 is misplaced. In *Harris*, the Supreme Court reasoned that, when Title XIX was enacted, Congress did not intend for a participating State "to assume a *unilateral* funding obligation for any health service in an approved Medicaid plan," and thus, a participating State need not include in its Medicaid plan "any services for which a subsequent

Congress has withheld federal funding." 448 U.S. at 309 (emphasis added); *see also id.* ("Title XIX does not obligate a participating State to pay for those medical services for which federal reimbursement is unavailable."). *Harris* concerned a series of appropriation bill amendments or joint resolutions known as the "Hyde Amendment," which prohibited the use of appropriated funds to perform abortions except in certain circumstances.[11] *See* 448 U.S. at 302–03. Importantly, no contention was made in *Harris* that the abortions expressly defunded by the Hyde Amendment were nevertheless covered in a different statute; *Harris* did not involve any pre-existing mandate to fund abortions. In contrast, in this matter, plaintiffs and the State of Washington have identified the PRWORA as legislation that predated and was unaffected by HR 1 and that contemplates *bilateral* funding pursuant to the Medicaid program. *Harris* offers no guidance concerning the precision with which Congress must indicate its intent to defund Medicaid for an entire class of people (*i.e.*, qualified noncitizens who receive SSI benefits, but are not LPRs, Cuban or Haitian entrants, or residing in the United States pursuant to a COFA).

Defendants contend that plaintiffs' "primary error lies in their failure to recognize OBBBA § 71109 . . . as an exercise of Congress's Spending Power." Defs.' Resp. at 9 (docket no. 21). Defendants, however, are the ones who have erred. Although Congress

---

[11] In *Harris*, the question was whether the Hyde Amendment, in denying public funding for certain medically necessary abortions, contravened the liberty or equal protection guarantees of the Due Process Clause of the Fifth Amendment or the Religion (Establishment or Free Exercise) Clauses of the First Amendment. *See* 448 U.S. at 301 & 312–27. Those types of constitutional issues are not presented in this case.

has "absolute" control over federal expenditures, *see* *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012), Congress did not exercise its spending power in the manner in which defendants suggest; it did not defund the Medicaid benefits authorized in the PRWORA. Thus, defendants' reliance on authorities discussing appropriations riders is misplaced. Nothing in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016),[12] *Neguse v. U.S. Immigration & Customs Enforcement*, 822 F. Supp. 3d 86 (D.D.C. 2026), *appeal filed*, No. 26-5072 (D.C. Cir. Mar. 3, 2026),[13] or *Mayor & City Council of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 816 F.

---

[12] In *McIntosh*, various criminal defendants attempted to avoid prosecution for federal marijuana offenses on the ground that an appropriations rider prohibited the United States Department of Justice ("DOJ") from spending funds to prevent states from implementing medical marijuana laws. *See* 833 F.3d at 1168. The criminal defendants sought to dismiss their indictments or enjoin their prosecutions on the theory that the DOJ was precluded from spending funds to prosecute them. *Id.* at 1169. The Ninth Circuit concluded that the appropriations rider prohibited the DOJ from spending funds to prosecute individuals who engaged in conduct permitted by their states' medical marijuana laws, but it did not prevent the DOJ from prosecuting individuals who were not complying with their states' medical marijuana laws. *Id.* at 1177–78. *McIntosh* is factually and procedurally distinguishable.

[13] In *Neguse*, Representative Joe Neguse of Colorado and twelve of his colleagues sued the United States Department of Homeland Security ("DHS") and United States Customs and Immigration Enforcement ("ICE"), seeking to enjoin a policy requiring that members of Congress provide seven days of advance notice before being allowed into a DHS or ICE detention facility. 822 F. Supp. 3d at 92. They premised their claim on "an appropriations rider attached to DHS's annually appropriated funds which prohibits DHS from 'us[ing]' appropriated funds 'to prevent' Members of Congress from 'entering, for the purpose of conducting oversight,' specific DHS facilities." *Id.* Despite former DHS Secretary Kristi Noem's instruction that the challenged policy be promulgated and implemented solely with OBBBA funds, the D.C. District Court concluded that DHS had likely used its annually appropriated funds to promulgate and enforce the seven-day-notice policy and thereby violated the restrictions imposed on the use of such funds. *Id.* at 102–15. *Neguse* actually undermines defendants' position. Notwithstanding Secretary Noem's attempt to invoke HR 1 as a funding mechanism, the district court ruled that DHS and ICE were bound by the requirements of legislation predating HR 1.

Supp. 3d 107 (D.D.C. 2026),[14] supports defendants' view, as expressed in the SHO Letter,[15] that congressional silence is sufficient to strip away benefits conferred in a statute, like the PRWORA, that has not been repealed or amended.

Defendants' "appropriation rider" theory is nothing more than an assertion of implicit repeal, which is contrary to the reasoning in *Maine Community Health Options v. United States*, 590 U.S. 296 (2020). In that case, the Supreme Court held that Congress did not implicitly repeal, via an appropriations rider, the statute creating the Risk Corridors program, § 1342 of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119, 211–12 (2010), codified at 42 U.S.C. § 18062, or the related obligation to pay ACA insurance providers pursuant to the Risk Corridors program. *See* 590 U.S. at 315–21. The Supreme Court observed that "repeals by implication are not favored" and the "aversion to implied repeals is 'especially' strong 'in the appropriations context.'" *Id.* at 315.

---

[14] Defendants have entirely missed the mark in citing this case involving the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), from which Baltimore's mayor and city council sought, via the Freedom of Information Act ("FOIA"), data concerning firearms recovered in Baltimore. 816 F. Supp. 3d at 109. The ATF invoked a FOIA exemption that refers to statutes protecting certain records from disclosure. *Id.* at 111. The statutes at issue, known as the Tiahrt Riders, indicate that no appropriated funds may be used to respond to FOIA requests for firearms trace data and that "all such data shall be immune from legal process." *See id.* at 111–12. The pending matter does not involve FOIA or any exemptions to FOIA requests, and the fact that an appropriations rider provided a basis for invoking a FOIA exemption is not at all relevant to the issues now before the Court.

[15] *See* SHO Letter at 7, Ex. A to Kas Decl. (docket no. 6 at 11) ("[N]either the text of . . . [HR 1] nor its legislative history demonstrates a clear Congressional intent to require that states provide full Medicaid benefits to qualified noncitizens without receiving federal matching funds for that coverage.").

HR 1 uses some form of the term "amend" 912 times, and the words "repeal," "repeals," or "repealed" appear in the bill 39 times, including in the Table of Contents. The PRWORA is mentioned five times, but never for the purpose of amending or repealing any provision of the act. Rather, on four occasions, the PRWORA is cited as a reference for the term "Compact of Free Association." *See* Pub. L. No. 119-21, §§ 10108, 71109, 71201, & 71301, 139 Stat. 72, 85, 297, 319, & 321–22 (2025) ("a Compact of Free Association referred to in section 402(b)(2)(G) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996"). The fifth appearance of the PRWORA in HR 1 is in conjunction with $3.33 billion appropriated to the Attorney General for the DOJ to fund various efforts, including investigating and prosecuting "violations of or fraud relating to title IV" of the PRWORA. *Id.* at § 100054, 139 Stat. at 390.

In contrast to the congressional silence concerning any revision of the PRWORA, with respect to the Supplemental Nutrition Assistance Program ("SNAP"), Medicare (as opposed to Medicaid), and health care insurance premium tax credits, in HR 1, Congress *specifically amended* the relevant statutes, as follows:

- In § 10108 of HR 1, a section of the Food and Nutrition Act of 2008 that lists conditions rendering individuals ineligible to participate in SNAP, was amended to render ineligible individuals who are not United States citizens or nationals, LPRs, Cuban or Haitian entrants, or residing in the United States in accordance with a COFA. *See* 7 U.S.C. § 2015(f).

/ / /

- Similarly, § 71201 of HR 1 revised Title XVIII of the Social Security Act, which governs health insurance for the aged and disabled, also known as Medicare, to add a provision that disqualifies anyone who is not a United States citizen or national, an LPR, a Cuban or Haitian entrant, or residing in the United States in accordance with a COFA, except that individuals who were entitled to, or enrolled for, Medicare benefits as of July 4, 2025, may continue to receive such benefits for 18 months after the date HR 1 was enacted, *i.e.*, until January 4, 2027. *See* 42 U.S.C. § 1395mmm.
- With respect to the health care insurance premium tax credit authorized in the Internal Revenue Code, § 71301 of HR 1 expressly altered the meaning of "lawfully present" for the tax years beginning after December 31, 2026, to mean only United States citizens or nationals, LPRs, Cuban or Haitian entrants, or individuals residing in the United States in accordance with a COFA. 26 U.S.C. § 36B(e)(2).

In HR 1, Congress also amended Medicaid eligibility requirements, adding a new subparagraph to § 1902(e)(14) of the Social Security Act concerning the frequency of eligibility redeterminations for certain individuals, amending § 1917(f)(1) of the Social Security Act regarding home equity limits for LTC services, and creating a new provision of § 1902 of the Social Security Act that requires individuals, with some exceptions, to demonstrate "community engagement" to remain eligible for Medicaid. *See* Pub. L. No. 119-21, §§ 71107, 71108, & 71119, 139 Stat. 72, 295–97, 306–15 (2025).

As evidenced by its efforts with respect to SNAP, Medicare, health care insurance

premium assistance, and Medicaid, Congress knows how to amend statutes to retract public benefits and tax credits or to change eligibility requirements when it wishes to do so. Congress did not, however, apply its expertise with respect to, and did not amend, the PRWORA.

Plaintiffs assert that, because HR 1 did not annul or alter the PRWORA and does not explicitly address whether noncitizens receiving SSI benefits remain eligible for Medicaid-funded daily-living assistance and other nonemergent care, defendants have acted contrary to law and/or in an arbitrary and capricious manner in issuing the SHO Letter and State Implementation Tool. They rely on the following canons of statutory construction:

- the specific controls over the general provision, _see_ Pls.' Mot. at 14 (docket no. 4) (citing _RadLAX Gateway Hotel, LLC v. Amalgamated Bank_, 566 U.S. 639, 645 (2012));
- an earlier-enacted statute dealing with "a narrow, precise, and specific subject" is not "submerged" by subsequent legislation "covering a more generalized spectrum," _see_ _id._ at 14–15 (quoting _Radzanower v. Touche Ross & Co._, 426 U.S. 148, 153 (1976));
- a statute should be construed to give effect to all of its provisions so that "no part will be inoperative or superfluous, void or insignificant," _id._ at 15 (quoting _Corley v. United States_, 556 U.S. 303, 314 (2009));

/ / /

/ / /

- a repeal by implication will not be inferred unless the later statute "expressly" contradicts the earlier law, see id. at 15–16 (citing Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 662 (2007)); and
- courts should endeavor to harmonize seemingly inconsistent laws, see id. at 16.

The fourth canon invoked by plaintiffs has already been discussed, and it provides ample support for the conclusion that HR 1 did not revoke the Medicaid benefits authorized by the PRWORA. The remaining canons, which require the Court to give effect to the more specific, narrower PRWORA, to the extent that it conflicts with HR 1, to not render any statutory provision (like the definition of "medical assistance") superfluous, and to harmonize the two statutes, also favor the statutory interpretation advocated by plaintiffs. The PRWORA deals with qualified noncitizens who receive SSI benefits, which is a subset of qualified noncitizens and of noncitizens generally. HR 1 does not explicitly address the specific group for whom the PRWORA has authorized Medicaid-funded nonemergent medical assistance. Thus, HR 1 cannot be construed as altering the benefits allowed by the PRWORA or the related funding. See RadLAX Gateway, 566 U.S. at 645 ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one."); see also Morton v. Mancari, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

In their reply, plaintiffs cite to statements of HR 1's supporters in the House of Representatives that denied any intent to "kick[ ] disabled people off of Medicaid" and articulated a goal of removing "*illegal* aliens," as opposed to noncitizens who are lawfully in the United States by virtue of having been granted asylum, refugee status, or humanitarian parole. *See* Pls.' Reply at 8 (docket no. 24) (emphasis in original, citing 171 CONG. REC. H3039-08, H3043, H3044, & H3055 (daily ed. July 2, 2025) (statements of Reps. Scott,[16] Haridopolos,[17] & Foxx[18])).[19] Having reviewed HR 1, which addresses a wide range of subjects, particularly the provisions mentioned earlier (relating to Medicaid, Medicare, SNAP, and health insurance premium tax credits), as well as the legislative history on which plaintiffs rely, the Court is satisfied that, in its SHO Letter

---

[16] Representative Austin Scott of Georgia: "When the Democrats are telling you that we are kicking disabled people off of SNAP or we are kicking disabled people off of Medicaid, it is an absolute lie." 171 CONG. REC. H3039-08 at H3043.

[17] Representative Mike Haridopolos of Florida: "[W]e are protecting the most vulnerable. Please read the bill. Seniors in nursing homes are unaffected. Persons who are disabled are unaffected." 171 CONG. REC. H3039-08 at H3044.

[18] Representative Virginia Foxx of North Carolina: "[T]here will be no cuts to Medicaid. The One Big Beautiful Bill Act protects and strengthens Medicaid for those who rely on it -- pregnant women, children, seniors, people with disabilities, and low-income families -- while eliminating waste, fraud, and abuse. The One Big Beautiful Bill Act removes illegal aliens, enforces work requirements, and protects Medicaid for the truly vulnerable." 171 CONG. REC. H3039-08 at H3055; *see also id.* (After Representative Randy Fine of Florida stated that he "is here [*i.e.*, in Congress] to fight for Americans, and that is what this bill [*i.e.*, HR 1] does," Representative Jim McGovern of Massachusetts responded, "Mr. Speaker, I don't know if the gentleman has ever read the Medicaid statute, but undocumented immigrants are not entitled to receive Medicaid benefits, and they don't.").

[19] During oral argument, counsel for defendants suggested that the statements of Representatives Scott, Haridopolos, and Foxx were made before § 71109 was added to HR 1 via amendment by the Senate, but the proceedings cited by plaintiffs transpired after the Senate amendment. *See* 171 CONG. REC. H3039-08, H3039–40 (daily ed. July 2, 2025).

and related State Implementation Tool, HHS's CMS has misconstrued HR 1. The Court must presume that "Congress legislated with care" and knew how to accomplish what it wished, *see* *Johnson v. High Desert State Prison*, 127 F.4th 123, 130 (9th Cir. 2025), and the comments of HR 1's proponents make clear that Congress did not intend to render qualified noncitizen SSI recipients ineligible for Medicaid benefits. Thus, plaintiffs have established a likelihood of success on the merits of their APA claims or, at least, have raised serious questions going to the merits.

**C. Likelihood of Irreparable Harm**[20]

Contrary to defendants' contention, *see* Defs.' Resp. at 14–15 (docket no. 21), the record does not support a finding that plaintiffs delayed in seeking judicial relief. Defendants assert that plaintiffs were "on notice that non-FFP-eligible noncitizens would not be supported by FFP as long ago as July 4, 2025, when OBBBA was enacted, and any doubt that HHS would interpret OBBBA § 71109 based on its plain unambiguous language was dispelled as soon as the SHO letter was issued." *Id.* at 15. The SHO Letter was not, however, addressed to plaintiffs, but rather to the State Health Official for the State of Washington, and defendants offer no evidence that plaintiffs were aware of the erroneous views expressed by HHS's CMS in the SHO Letter before they received communications from the Washington State Department of Social and Health Services ("DSHS"). On August 12, 2026, Matsai received notice from DSHS about the possible

---

[20] For purposes of plaintiffs' motion for a preliminary injunction, defendants do not challenge Neighborhood House's or Matsai's standing to bring the APA claims at issue.

termination of her Medicaid benefits. *See* Matsai Decl. at ¶ 7 (docket no. 5). On August 20, 2026, Neighborhood House received from DSHS a list of 220 individuals (150 of whom are SSI recipients) who are scheduled to lose their Medicaid-funded LTC or daily-living assistance services on October 1, 2026, as a result of HHS's and CMS's misinterpretation of HR 1. Romero Decl. at ¶ 14 (docket no. 10). This action commenced on August 25, 2026, and plaintiffs' pending motion for a preliminary injunction was filed on August 28, 2026. Plaintiffs have acted expeditiously in seeking judicial relief.

Plaintiffs have also established a likelihood of irreparable harm in the absence of preliminary injunctive relief. Through the Medicaid program, Matsai receives 158 hours per month of paid caregiving services. Matsai Decl. at ¶ 5 (docket no. 5). Her daughter provides these services. *Id.* at ¶ 6. Matsai's only source of income is $601 per month in SSI benefits. *Id.* at ¶ 10. If Matsai loses the Medicaid daily-living assistance funding, her daughter will need to seek other employment to help pay for rent. *Id.* at ¶ 11. Matsai will then be without help in food preparation, mobility and fall prevention, hygiene, medication management, and vital sign monitoring. *See id.* at ¶¶ 3–4 & 12. The lack of daily-living assistance poses a reasonably foreseeable risk of Matsai's health declining, potentially leading to permanent disability or death. *See id.* at ¶ 14. In addition, without Medicaid coverage, Matsai will be unable to afford medical treatment or prescription refills without foregoing food or other necessities. *See* Matsai Decl. at ¶¶ 2–4 (docket no. 26).

/ / /

Neighborhood House offers care coordination for individuals in King County who speak Ukrainian, Farsi, Dari, Pashtu, Arabic, Amharic, Tigrinya, and Oromo. Romero Decl. at ¶ 10 (docket no. 10). Based on its understanding that, in the absence of the requested preliminary injunction, 150 of its clients will lose Medicaid coverage on October 1, 2026, Neighborhood House estimates that it could lose over $450,000 per year in revenue, meaning that it will likely be required to lay off two to three employees and otherwise reduce program expenses. *See* Buck Decl. at ¶¶ 5 & 8 (docket no. 7); Deguchi Decl. at ¶ 10 (docket no. 9). These staffing and service reductions would, of course, affect Neighborhood House's clients,[21] and in the event that Neighborhood House prevails in this action, the harm done during the interim, if implementation of the SHO Letter and related tool are not enjoined, could be irreparable.

Defendants' characterization of plaintiffs' likely harms as vague and speculative is cavalier and disconnected from reality. Plaintiffs in this matter have offered specific, quantified, and undisputed evidence concerning what the loss of Medicaid-funded daily-living assistance would mean for Neighborhood House and its clients, including Matsai

---

[21] The mother of declarant Wahid Amiri is one of Neighborhood House's clients. *See* Amiri Decl. at ¶ 2 (docket no. 11). Amiri worked with U.S. officials in Afghanistan for nine years and, in 2021, when the Afghan government collapsed, his mother fled from the Taliban to the United States, where she was granted asylum. *Id.* at ¶ 3. She currently receives SSI benefits and 158 hours per month of Medicaid-funded daily-living assistance. *Id.* at ¶¶ 4 & 7. If she becomes ineligible for Medicaid, Amiri will have to find another job and leave his mother without assistance during the day. *See id.* at ¶¶ 10–11. Amiri has expressed legitimate concern that, in the absence of a caregiver, his mother might not take the correct medications, might not attend medical appointments, or might fall or otherwise injure herself, and that she might not recover if her health worsens. *See id.* at ¶¶ 12–15.

and Amiri's mother. Indeed, the economic injury alone (i.e., the proposed termination of Medicaid funding for certain qualified noncitizen SSI recipients) is sufficient to constitute irreparable harm because monetary damages (i.e. backpay of Medicaid benefits) would not be available later if plaintiffs prevail on their APA claims. *See City & County of San Francisco v. USCIS*, 981 F.3d 742, 762 (9th Cir. 2020).

**D. Balance of Equities and Public Interest**

Defendants have not articulated any ill effect of enjoining HHS, CMS, and Secretary Kennedy from implementing an incorrect interpretation of HR 1, and the Court cannot envision any. Thus, the balancing of equities tips "sharply" in plaintiffs' favor for purposes of both the *Winter* standard and the sliding scale articulated in *Alliance for the Wild Rockies*. *See* 632 F.3d at 1131–32. The public has no interest in allowing a federal agency to act inconsistently with Congressional intent, and the Court concludes that all factors outlined in *Winter* have been met. *See* 555 U.S. at 20.

**E. Scope of Preliminary Injunction**

Defendants contend that the requested preliminary injunction should be limited to Matsai and the clients of Neighborhood House who receive SSI benefits and are not among the individuals listed as "FFP-eligible" in 42 U.S.C. § 1396b(v)(5). *See* Defs.' Resp. at 18 (docket no. 21). The State of Washington asks that the requested preliminary injunction operate statewide because it is required "to treat all categorically needy Medicaid beneficiaries the same." Wash.'s Reply at 5 (docket no. 23). The State of Washington contends that a preliminary injunction limited in scope as defendants propose would place the State of Washington in jeopardy of violating federal law. *See id.*

at 5–6. Plaintiffs also request that the proposed preliminary injunction operate statewide because enjoining HHS and CMS from implementing their incorrect interpretation of HR 1 would necessarily have effect beyond just Matsai and the clients of Neighborhood House. *See* Pls.' Reply at 9–10 (docket no. 24). The Court is persuaded by the State of Washington's and plaintiffs' arguments, and it further concludes that requiring every qualified noncitizen SSI recipient in the State of Washington (other than Neighborhood House's clients) to file suit to reap the benefit of the preliminary injunction issued in this action would place an enormous and unnecessary burden on those individuals, as well as the judiciary. Statewide relief is therefore warranted. *See* *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1027–29 (9th Cir. 2025) (concluding that nationwide relief was required because a preliminary injunction could not be structured on an individual basis).

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) Plaintiffs' motion for a preliminary injunction, docket no. 4, is GRANTED.

(2) Pending further order of the Court, defendants HHS and Secretary Kennedy and all of their respective officers, agents, servants, employees, and attorneys are hereby preliminarily ENJOINED from (a) enforcing, implementing, or otherwise giving effect to the SHO Letter and the State Implementation Tool as to all qualified noncitizen SSI recipients in the State of Washington, and/or (b) terminating Medicaid healthcare funding for any qualified noncitizen SSI recipients in the State of Washington.

(3) No security bond is required. *See* 5 U.S.C. § 705; *see also* *California v. U.S. Dep't of Agriculture*, 821 F. Supp. 3d 1015, 1035 (N.D. Cal. 2026) (refusing to

impose a bond because "no showing has been made that a 'realistic likelihood of harm'" to the federal agency would occur if, during the pendency of the preliminary injunction, it could not disallow funding).

(4) The Clerk is directed to send a copy of this Order to counsel for the parties and the State of Washington.

IT IS SO ORDERED.

Dated this 30th day of September, 2026.

Thomas S. Zilly
United States District Judge